1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN VAI DICH,

11            Petitioner,                No. CIV S-10-0172 GEB EFB P

12        vs.

13   FRANCISCO JACQUEZ,

14            Respondent.               FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 2006 judgment of conviction

18   entered against him in the Sacramento County Superior Court on a charge of first degree murder

19   with use of a firearm.  He seeks relief on the grounds that: (1) jury instruction error violated his

20   right to due process; (2) the trial court violated his right to due process when it improperly

21   refused to admit certain statements into evidence; and (3) the trial court's response to a jury

22   question violated his constitutional rights.  Upon careful consideration of the record and the

23   applicable law, the undersigned recommends that petitioner's application for habeas corpus relief

24   be denied.

25   ////

26   ////

1

## I.   Factual Background[1]

On a December night just before Christmas, Matthew Seivert was lured to Tahoe Park in Sacramento by his ex-girlfriend, Nicole Carroll.  As the couple talked on a park bench, a group of 12 youths in three separate cars waited stealthily to attack him.  When Seivert got into his car and attempted to leave, the youths blocked his exit and one of them shot him to death.

Carroll and four members of the group were charged with murder. Six other youths, who were granted immunity, testified at the trial, during which the jury heard evidence of a conspiracy to "jump" Seivert because he had made racial slurs about Asians.  The jury found all five defendants guilty of first degree murder (Pen.Code, § 187, subd. (a))[2] and found true the special circumstance that the shooter, defendant Hung Thieu Ly, committed the murder while lying in wait (§ 190.2, subd. (a)(15)) (hereafter section 190.2(a)(15)).

Ly and his four convicted accomplices – Nicole Carroll, Jimmy Chi Cooc, John Dich and Chan Venh ("John") Lam – appeal. Their arguments include erroneous jury instructions, error in admission and exclusion of evidence, prosecutorial misconduct, and the sufficiency of the evidence to support the verdict.  We find no prejudicial error.  With the exception of a minor sentencing correction as to defendant Ly, we shall affirm all five judgments.

**FACTUAL BACKGROUND**

**The shooting**

On December 23, 2003, 19-year-old Matthew Seivert was living with his mother, Stepheny Milo, at her home in East Sacramento. Seivert and Carroll had been high school sweethearts, but they broke up when Carroll moved to Los Angeles in 2001.  Around 8:00 p.m., Carroll called for Seivert, but he was not home.  Seivert received a second call shortly before midnight, after which he asked his mother if he could borrow her Toyota Camry so he could "see Nicole."  Although Milo initially refused, she finally relented and let her son borrow the car.

Around 1:45 a.m., Sacramento City Police Officer Barry Lee went to Tahoe Park in response to a report of shots fired.  Lee drove around the park, but saw nothing.  At 2:20 a.m., Lee returned to a

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[2]  Undesignated statutory references are to the Penal Code.

2

location on Eighth Avenue, very close to the park, and discovered the Camry, which had crashed up against a chain link fence. Seivert, unconscious and incoherent, was transported by ambulance from the Camry to the hospital.

Seivert suffered two gunshot wounds, one to the left side of the head and another to the right chest. He also suffered lacerations and abrasions, consistent with having been struck by flying glass. Seivert died from his wounds.

Three bullet jackets from a .38-caliber Charter Arms revolver were recovered from the Camry. There was possible bullet damage to the front driver's-side window, the rear driver's-side window and the rear window. A detective who inspected the Camry opined that gunshots had pierced each of the three windows.

**The plot**

Six immunized witnesses – Quoc Lam,[3] Sieu Nguyen, Johnson Phan, Dac Su, Davis To and Damon Voong – testified about a meeting that took place at Voong's house on the evening of December 23, during which the plan was hatched to attack Seivert at Tahoe Park. Sometimes their versions coincided; often their testimony conflicted not only with each other, but with the same witness's prior statements. In accordance with settled principles (*People v. Sotomayor* (1996) 47 Cal.App.4th 382, 386, 54 Cal.Rptr.2d 871; *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574] ), we recite the evidence in the light most favorable to the judgments.

John Lam, who was then dating Nicole Carroll, was angry with Seivert for making disparaging remarks about Asians in phone calls to Carroll, saying things like "fuck Asians" and referring to them as "Chinks." Lam devised a plan whereby Carroll would phone Seivert and ask him to meet her at Tahoe Park; Lam and his friends would drive to the park, wait for Seivert and then "jump" him or beat him up.

Lam called his cousin Quoc and told him about the plan to lure Seivert to the park and jump him. Quoc went to his house and got his nunchakus. He also had golf clubs in his trunk, which he thought could be used. Lam called his cousin Davis To and told him he wanted to "kick this white kid's ass" for making racial slurs. Lam's friends and relatives contacted others, until 11 young men arrived at Voong's house, where they met with Carroll and Lam. At the meeting were the five defendants – Carroll, Cooc, Dich, Lam and Ly – as well as the witnesses who testified under a

---

[3] To avoid confusion with defendant John Lam, we hereinafter refer to John Lam as "Lam" and his cousin, Quoc Lam, as "Quoc."

grant of immunity.

At Voong's house, Lam brought up the subject of beating up the "white boy" to "teach him a lesson" about using racial slurs. Carroll said she wanted Seivert beaten up because she did not like him. Lam explained that Seivert would meet Carroll at Tahoe Park, that the group should wait for him to get out of his car and then jump him. Quoc intended to approach Seivert from behind, hit him a couple of times and smash his car with the nunchakus. Su intended to jump out of Quoc's car and beat Seivert up. There was some discussion at the house about Cooc and Ly having guns. However, killing or shooting Seivert was not explicitly discussed.

During the meeting at Voong's house, Carroll called Seivert. Later, after speaking on her cell phone, she told the group that Seivert had called and they should go to Tahoe Park. Lam told everyone "let's go" and instructed them to leave for the park. He told Quoc to meet him on the other side of the park and to block the Camry.

The group traveled to Tahoe Park in three separate vehicles. The table below[4] shows the vehicles that were driven and their respective drivers and occupants.

Acura RSX

**John Lam** (driver )*
**Nicole Carroll***

Honda Pilot

**John Dich** (driver )*
**Jimmy Chi Cooc***
**Hung Thieu Ly***
Johnson Phan
Sieu Nguyen
Damon Voong
Tommy Vu

Honda Accord

Quoc Lam (driver )
Dac Su
Davis To
Johnny Truong

*Defendants' names appear in boldface type.

---

[4] The table is derived from Ly's opening brief. No one disputes its accuracy.

As they drove to the park, Cooc and Dich had a conversation about a gun.  Dich wanted to see Cooc's nine-millimeter gun, and it was passed around the Honda Pilot.  Ly's .38-caliber revolver was also passed around.  Ly tied a blue or black rag around his face that covered his nose and mouth.

The three cars split up when they got to the park.  They waited about 15 minutes for Seivert to arrive.  Carroll alerted them by phone that Seivert was on his way.

Seivert arrived at the park, got out of his Camry and approached Carroll, who was seated on a bench.  The couple talked for a few minutes.  Seivert reached for Carroll, but she pulled away.  Seivert then returned to the Camry.  Lam and Dich each said, "Let's go get him," or words to that effect.  Because Seivert had backed into the parking space, someone in the Pilot said, "Block him out."  Dich then drove the Pilot toward the driver's side of the Camry, parking at an angle.  The Camry moved forward a little, but Lam's Acura RSX also pulled in front of the Camry, causing it to stop.  The Camry was blocked in and had no room to leave.  Quoc retrieved the nunchakus and Dac Su took out a golf club.

Ly got out of the Pilot and pulled a gun from his waistband.  Cooc also got out of the car with his gun drawn.  Vu threw a Heineken bottle, which hit the Camry.  Ly stood in front of the Camry and pointed his gun at the front windshield saying, "Don't move" or "stop, stop, stop."  Some witnesses thought Seivert revved the engine and the Camry may have moved forward a little.

Ly fired at least three shots at the Camry.  The first shot was fired at the front windshield, the second shot from the driver's side door, and the third from behind the Camry by the trunk.  The group then returned to their vehicles and drove back to Voong's house.  On the way back, Ly exclaimed, "I got him in the head," or "I got him, I got him.  He almost ran me over."  Ly also said, "I did what I had to do," and "if he hadn't of moved I wouldn't have shot him.  He almost ran me over."

Back at the house, Carroll smiled and said something to the effect of "Oh, well, I didn't like him anyways."  About a week later, Lam called To and said he had spoken with a homicide detective and that he (To) should keep his story straight.

On January 10, 2004 (all further calendar references are to that year), about three weeks after the shooting, police recovered a loaded nine-millimeter semiautomatic firearm from Cooc's residence.  Two days later, police recovered the .38-caliber revolver used to kill Seivert from Dich's residence.

////

5

Police recovered a box of .38-caliber live ammunition from Ly's home.  The cartridges were loaded with soft-point, brass-jacketed Winchester .38 Special bullets – similar in all respects to the bullets fired into the Camry.  They also found two bandanas, one dark navy blue and the other black.

Mobile phone records showed that defendants and the other participants placed numerous calls on their cell phones to one another throughout the late night and early morning hours of December 23 and 24, 2003.  Carroll's cell phone records showed that she called Seivert's residence at 7:22 p.m. and 11:47 p.m.  In addition, she called Seivert's cell phone at 12:39 a.m., 12:47 a.m. and 12:55 a.m. (minutes before the shooting), each time using "*67," which is a means of blocking the calling number from display on the receiver's phone.

**Defense case**

None of defendants testified.  Defense counsel focused their defense on four central themes: (1) the prosecution witnesses who testified about the plot and shooting were unreliable and self-contradictory; (2) no one who participated in the plot to "jump" Seivert said anything about shooting him; (3) Ly's decision to shoot Seivert was the unanticipated act of a maverick, and thus the crime of murder was not the natural and probable consequence of the agreement to beat up the victim; and (4) under the doctrine of imperfect self-defense, Ly's shooting of Seivert was not murder because Ly harbored a good faith but unreasonable belief that Seivert was trying to run him over with the Camry.

The jury found Ly guilty of first degree murder with personal use of a firearm (§ 12022.53, subd. (d)); the jury also found true as a special circumstance that he intentionally killed the victim by lying in wait.  Defendants Carroll, Cooc, Dich and Lam were found guilty of first degree murder, with a special finding that they were armed within the meaning of section 12022, subdivision (a)(1).

*People v. Hung Thieu Ly*, No. C052280, 2008 WL 4329226 at **1-4 (Cal.App. 3 Dist. Sept. 23, 2008) (hereinafter Opinion).

////

////

////

////

////

**II.     Procedural Background**

Petitioner's judgment of conviction was affirmed in its entirety by the California Court of Appeal for the Third Appellate District. Resp.'s Lodg. Doc. 13.[5] Petitioner subsequently filed a petition for review in the California Supreme Court, which was summarily denied. Resp.'s Lodg. Docs. 10, 14. Petitioner filed his federal habeas petition in this court on January 19, 2010.

**III.    Analysis**

**A.  Standards for a Writ of Habeas Corpus**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v.*

---

[5] The Court of Appeal later modified its opinion without changing the judgment. Dckt. No. 9 at 9.

1   *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

2   (2000)).   Nonetheless, "circuit court precedent may be persuasive in determining what law is

3   clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d

4   at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

5        A state court decision is "contrary to" clearly established federal law if it applies a rule

6   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

7   precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

8   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

9   the writ if the state court identifies the correct governing legal principle from the Supreme

10  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[6]

11  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

12  F.3d 997, 1002 (9th Cir. 2004).   In this regard, a federal habeas court "may not issue the writ

13  simply because that court concludes in its independent judgment that the relevant state-court

14  decision applied clearly established federal law erroneously or incorrectly.   Rather, that

15  application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v.*

16  *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

17  habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

18  the state court was 'erroneous.'").   "A state court's determination that a claim lacks merit

19  precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

20  of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

21  (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   Accordingly, "[a]s a

22  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

23  state court's ruling on the claim being presented in federal court was so lacking in justification

---

24        [6] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
25  overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
26  (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

9

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

**B.  Petitioner's Claims**

**1.  Erroneous Jury Instruction on Felony Murder**

Petitioner's first claim is that the trial court violated his right to due process when it gave an erroneous felony-murder jury instruction.  Dckt. No. 1 at 4; Dckt. No. 15 at 12-21.[7]  The California Court of Appeal explained the legal and factual background to this claim, and its ruling thereon, as follows:

**I. CALJIC No. 8.51- *Ireland*[8] Error**

During an in-chambers discussion, Carroll's attorney asked that the jury be instructed on second degree felony murder.  (CALJIC No. 8.32.)  The prosecutor was opposed, pointing out that there would be no predicate crime to which such an instruction could attach, and the trial court agreed.  In conformance with this ruling, the court deleted all references to felony murder in CALJIC Nos. 8.10 and 8.50.  The clerk's transcript reflects that the court refused defense requests for CALJIC Nos. 8.32 (second degree felony murder) and 8.34 (second degree felony murder-aider and abettor liability).  Nevertheless, at the request of defendants Carroll, Cooc and Ly, the trial court did give CALJIC No. 8.51.  As read to the jury, the instruction stated:

"*If a person causes another's death, while committing a felony which is dangerous to human life, the crime is murder*.  If a person causes another's death, while committing a misdemeanor which is dangerous to human life under the circumstances of its commission, the crime is involuntary manslaughter.  [¶]  There are many acts which are lawful but nevertheless endanger human life.  If a person causes another's death by doing an act or engaging in conduct in a criminally negligent manner, without realizing the risk involved, he is guilty of involuntary manslaughter. [¶]  If, on the other hand, the person realized the risk and acted in total

---

[7]  Page number citations such as these are to the page number reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

[8]  *People v. Ireland* (1969) 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (*Ireland*).

disregard of the danger to life involved, malice is implied, and the crime is murder."  (CALJIC No. 8.51, italics added.)

Although the jury was never told which crime could qualify as a "dangerous-to-human-life" felony within the meaning of the above instruction, they were given CALJIC No. 9.02, which sets out the elements of assault by means likely to produce great bodily injury (hereafter also felonious assault).

All five defendants now claim that the giving of a felony-murder charge to the jury constituted prejudicial error because, under the "merger" doctrine, felonious assault may not be used as a predicate felony for applying the felony-murder rule.  (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.)

We initially conclude that Carroll, Cooc and Ly are estopped from raising this claim.  CALJIC No. 8.51 was explicitly requested by all three defendants.  When defense counsel makes a deliberate, tactical choice to request a particular instruction, the rule of invited error applies, and the defendant cannot challenge it on appeal. (*People v. Wader* (1993) 5 Cal.4th 610, 657-658, 20 Cal.Rptr.2d 788, 854 P.2d 80.)  Here, defendants had a tactical purpose in requesting a felony-murder instruction.  A reflexive adoption of the felony-murder rule using the predicate crime of felonious assault would have produced a verdict of second degree murder. (*Ireland, supra*, 70 Cal.2d at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580.)  A felony-murder instruction thus gave the jurors the option of shortcutting to a verdict of second degree murder without undertaking the more probing inquiry of whether defendants should be found guilty of *first degree* murder based on premeditation and/or lying in wait.  Because there was a plausible tactical reason for requesting CALJIC No. 8.51 (i.e., avoiding a first degree murder verdict), Carroll, Cooc and Ly are precluded from challenging it on appeal.  (*People v. Hardy* (1992) 2 Cal.4th 86, 152, 5 Cal.Rptr.2d 796, 825 P.2d 781.)  However, we must still decide whether the instruction was prejudicial as to Dich and Lam.

In *Ireland, supra*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, the California Supreme Court adopted the "merger" rule in a case involving the underlying felony of assault with a deadly weapon, where the defendant had shot and killed his wife.  The jury was instructed that the defendant could be convicted of second degree murder based on the felony-murder rule "'when the killing is a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, *such as an assault with a deadly weapon*.'"  (*Id.* at p. 538, 75 Cal.Rptr. 188, 450 P.2d 580, italics added.)

The state Supreme Court reversed, reasoning that "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases

wherein homicide has been committed as a result of a felonious assault – a category which includes the great majority of all homicides.  This kind of bootstrapping finds support neither in logic nor in law." (*Ireland, supra*, 70 Cal.2d at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580.)  The court therefore concluded that the offense of assault with a deadly weapon, which was "an integral part of" and "included in fact " within the homicide, could not support a second degree felony-murder instruction.  (*Ibid.*)

As the People concede and the trial court recognized at the hearing on the motion for new trial, it was *Ireland* error to include the first sentence of CALJIC No. 8.51 in the instruction.  However, we also agree with the trial court that the error was harmless beyond a reasonable doubt.

When a jury is instructed on an irrelevant theory that may inject confusion into its deliberations, we ask whether "there is 'a reasonable likelihood' the jury understood the instructions as the defendant asserts." (*People v. Cain* (1995) 10 Cal.4th 1, 36, 40 Cal.Rptr.2d 481, 892 P.2d 1224, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399].)  In making this determination, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (*Estelle v. McGuire, supra*, 502 U.S. at p. 72, 112 S.Ct. at p. ---- [116 L.Ed.2d at p. 399]; *see also People v. Mincey* (1992) 2 Cal.4th 408, 451, 6 Cal.Rptr.2d 822, 827 P.2d 388.)

This case is analogous to *People v. Barnett* (1998) 17 Cal.4th 1044, 74 Cal.Rptr.2d 121, 954 P.2d 384.  There, the trial court instructed, in pertinent part: "'The crime of murder is the unlawful killing of a human being with malice aforethought *or unlawful killing of a human being which occurs during the commission or attempted commission of a felony inherently dangerous to human life*. [¶]  In order to prove the commission of the crime of murder, each of the following elements must be proved. . . .  [T]he killing was done with malice aforethought.'" (*Id.* at p. 1154, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Barnett argued that this instruction was prejudicial because it allowed the jury to convict him of murder based on the commission of felonies that were impermissible under the merger doctrine, such as assault or assault with a deadly weapon.  (*Ibid.*)  The California Supreme Court found no reversible error because the other instructions given clearly informed the jurors that there could be no conviction of first degree murder unless they found deliberation and premeditation.  (*Ibid.*)  Moreover, the record was clear that the prosecutor was arguing for conviction on the theory of deliberate and premeditated murder, not felony murder.  (*Id.* at pp. 1154-1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)  Accordingly, the court concluded, "no reasonable juror could possibly have understood that guilt could be predicated upon a felony-murder

theory." (*Id.* at p. 1155, 74 Cal.Rptr.2d 121, 954 P.2d 384.)

A similar result is mandated here. Unlike *Ireland* or the situation in defendants' favorite case, *Suniga v. Bunnell* (1993) 998 F.2d 664, 666, there was no instruction telling the jury *which felony* could qualify for felony-murder liability. The verdict form did not ask the jury to identify a felony underlying a finding of murder and the trial court expressly refused to give any other instructions on the felony-murder rule. Under these circumstances, giving the first sentence of CALJIC No. 8.51 was akin to giving the jury a rod and a line, but no hook, lure or bait, and expecting it would catch a fish. The first sentence of CALJIC No. 8.51 was nothing but an orphaned charge that found no support in the other instructions with which the jury had to grapple.

Defendants hypothesize that the instruction was prejudicial because it could have induced the jury to assume the existence of malice without making the necessary findings on the elements thereof. However, nothing in CALJIC No. 8.51 told the jury it did not have to find malice before finding defendants guilty of murder. On the contrary, the instructions clearly required the jury to find malice in order to convict defendants of murder.[9] The jury was also instructed that the malice element would be negated if the killing was done in the heat of passion or under an unreasonable belief in the need for self-defense. These instructions are inherently inconsistent with the concept that a killing by means of felonious assault is automatically murder; and it would be unreasonable to conclude that the jury simply tossed them aside in favor of an incomplete felony-murder charge that did not identify a predicate felony for its application. (*See People v. Coddington* (2000) 23 Cal.4th 529, 594, 97 Cal.Rptr.2d 528, 2 P.3d 1081 [courts presume that jurors approach the instructions with intelligence and common sense], *overruled on other grounds* in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.) We find it unlikely the jury viewed the first sentence of CALJIC No. 8.51 as anything other than an irrelevant instruction that had no applicability to the case.

Lastly, neither the prosecutor nor defense counsel suggested to the jury that it could return a murder verdict based on the fact Seivert was killed during the commission of a felonious assault. Instead, the prosecutor urged the jury to return a verdict of first degree murder by lying in wait which, according to the instructions, required findings of (1) intent to inflict bodily harm involving a

---

[9] Using the language of CALJIC No. 8.10, the trial court told the jury: "Defendants are accused of having committed the crime of murder. . . . [¶] . . . In order to prove this crime *each of the following elements must be proved*: [¶] . . . [¶][T]he killing was done with malice aforethought." (Italics added.) Using the language of CALJIC No. 8.11, the court then set out the legal requirements for a finding of malice.

high degree of probability that it will result in death; (2) wanton disregard for human life; and (3) "a state of mind equivalent to premeditation or deliberation."  The jury's verdict of first degree murder against accomplices Carroll, Cooc, Dich and Lam, coupled with its special-circumstance finding that Ly murdered by lying in wait, renders it virtually certain that the jury did not arrive at a murder verdict by using the felony-murder rule.

We conclude beyond a reasonable doubt that any *Ireland* error was harmless.

Opinion at **4-7.

Petitioner challenges the conclusion of the California Court of Appeal that the trial court's instructional error was harmless.  He argues that the state court's decision is contrary to *In re Winship*, 397 U.S. 358 (1970), because the error allowed the jury to find him guilty of murder without a finding that he had the "required mental state of malice-aforethought." Dckt. No. 15 at 13-16.  Petitioner argues that the jury would certainly have used assault with a deadly weapon as the predicate felony for the felony-murder rule "since this was the *only* (non-murder) crime the jury was instructed on." *Id.* at 15.  He also argues that because the theory of liability as to all defendants other than Ly was so complex, the erroneous instruction "cleared for the jury an easy path to reaching its verdicts." *Id.* at 16.  Petitioner further argues that the Court of Appeal's conclusion that the jury simply ignored the erroneous instruction runs "counter to a sound presumption of appellate practice that jurors are reasonable and generally follow the instructions they are given." *Id.*  Finally, petitioner contends that the Court of Appeal improperly distinguished *Suniga* from the instant case because here, as in *Suniga*, "there is no reasonable possibility that the jury would not have been able to identify the underlying felony in this case as felony assault." *Id.* at 17-18.

////
////
////
////

14

In *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007), the United States Supreme Court clarified that the AEDPA did not replace the traditional test for prejudice on collateral review established in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).[10]  After *Fry*, a federal habeas court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* 507 U.S. 619.  Further, [w]hen a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable."  *Towery v. Schriro*  641 F.3d 300, 307 (9th Cir. 2010).[11]

As set forth above, the California Court of Appeal concluded that the instructional error in this case was harmless "beyond a reasonable doubt" because: (1) the erroneous jury instruction was an incomplete statement of the felony-murder rule, and was inconsistent with other jury instructions with regard to the requirement to find malice before reaching a guilty verdict on a murder charge, and was therefore unlikely to have been relied on by the jury in this case; (2) numerous other jury instructions informed the jury that it had to find malice in order to convict petitioner and the other defendants of murder; (3) other jury instructions, including one which informed the jury that the malice element could be negated by other factors in this case, were inconsistent with a theory that the jury did not have to find malice in order to convict the defendants of murder; (4) it was unreasonable to conclude that the jury ignored the bulk of the

---

[10]  *Brecht* held that on collateral review of a state court criminal judgment under 28 U.S.C. § 2254, an error is harmless unless it had "a substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 631.

[11]  The court notes that the instructional error at issue here is not a structural error which requires automatic reversal, but is a trial error subject to harmless error analysis.  *See Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (instructing a jury on multiple theories of guilt, one of which is invalid, is subject to *Brecht* harmless error analysis); *Neder v. United States*, 527 U.S. 1 (1999) (erroneous jury instruction that omits element of offense is subject to harmless-error analysis); *Byrd v. Lewis*, 566 F.3d 855, 863-64 (9th Cir. 2009) (harmless error review applies to an instructional error that affects an element of the offense, a permissible evidentiary inference, or a potential theory of conviction).

1   jury instructions and instead found the defendants guilty of murder without a finding of malice,

2   based on one incomplete instruction that did not tell the jury they could dispense with the malice

3   requirement; (5) the prosecutor specifically relied on a theory of first degree murder by lying in

4   wait, which required malice; and (6) the jury found defendants guilty of first degree murder by

5   lying in wait, which reflected that they did not rely on a felony murder theory to convict.  This

6   court agrees with the state appellate court that, under these circumstances, the trial court's

7   instructional error was harmless.  Viewing the trial record as a whole, including the entirety of

8   the jury instructions, and for the reasons expressed by the California Court of Appeal, the

9   erroneous language contained in CALJIC No. 8.51 could not have had a substantial or injurious

10   effect on the verdict in this case.  Certainly the decision of the California Court of Appeal is not

11   "so lacking in justification that there was an error well understood and comprehended in existing

12   law beyond any possibility for fairminded disagreement."  *Harrington*,131 S. Ct. at 786-87.

13        The court rejects petitioner's argument that CALJIC No. 8.51, as given, caused the jury

14   to disregard all of the other, correct instructions on the need to find malice in order to return a

15   first degree murder verdict.  There is no evidence that this is the case, and "a single instruction to

16   a jury may not be judged in artificial isolation, but must be viewed in the context of the overall

17   charge" *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  The court also notes that none of the

18   defendants in this case objected to the giving of CALJIC No. 8.51.  "It is the rare case in which

19   an improper instruction will justify reversal of a criminal conviction when no objection has been

20   made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

21        Petitioner's reliance on *Suniga v. Bunnell* in support of this claim is misplaced.  In

22   *Suniga*, a case decided prior to the enactment of AEDPA, the court gave both a proper murder

23   instruction and an improper felony-murder instruction.  However, unlike here, the jury was

24   specifically instructed that assault with a deadly weapon was a felony that is inherently

25   dangerous to human life.  998 F.2d at 667.  Further, in *Suniga*, it was not possible to determine

26   with certainty whether the jury relied on the unconstitutional theory to reach its guilty verdict.

1   *Id.* at 668, 669.  The Ninth Circuit recognized that the erroneous felony-murder instruction

2   permitted the jury to convict the defendant on the basis of a nonexistent legal theory.  *Id.*  In that

3   court's view, under these circumstances the erroneous instruction "infected the entire trial,"

4   violated due process, and required that the defendant's conviction be set aside without a showing

5   of harmless error.  *Id.*  Although the California Court of Appeal had found the instructional error

6   to be harmless, the Ninth Circuit was not required to defer to this determination because it was

7   not constrained by AEDPA.

8          Here, unlike in *Suniga*, the predicate offense for felony murder was not identified for the

9   jury, and the verdict indicated that the jury did not rely on a theory of felony-murder to find the

10  defendants guilty of murder.  Indeed, the California Court of Appeal opined that it was "virtually

11  certain that the jury did not arrive at a murder verdict by using the felony-murder rule."  Dckt.

12  No. 2-1 at 16.  *Suniga* is therefore factually distinguishable and does not dictate the result here.

13  *See Townsend v. Knowles*, 562 F.3d 1200, 1210 (9th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct.

14  193 (2009), *abrogated on other grounds* by *Walker v. Martin*, ___ U.S. ___ (2011)

15  (distinguishing *Suniga* and rejecting petitioner's claim that an erroneous felony-murder

16  instruction allowed his jury to find him guilty of murder without proof of malice aforethought, in

17  part because the jury verdict indicated that "the jury must have found that he acted with malice"

18  when they found petitioner guilty of second degree murder, which requires a finding of malice

19  aforethought); *Shackleford v. Hubbard*, 234 F.3d 1072, 1077-79 (9th Cir. 2000) (distinguishing

20  *Suniga* because, even though jury was instructed on non-existent felony murder theory, error was

21  harmless because it was certain that the jury returned a guilty verdict on the legally correct

22  theory of first-degree murder by torture); *Williams v. Carey*, No. C 05-3891 RMW(PR), 2010

23  WL 143465 at **4-5 (N.D. Cal. Jan. 5, 2010) (distinguishing *Suniga* and finding that erroneous

24  felony-murder instruction did not violate petitioner's right to due process where the jury was not

25  given any other instructions on the felony murder theory; the jury was not instructed on whether

26  any other felonies would qualify as an inherently dangerous felony; the trial court properly

17

1  instructed on second degree murder as well as express and implied malice; and the jury was

2  instructed to consider the instructions as a whole and in light of all the other instructions);

3  *Thomas v. Lamarque*, No. C 02-2981 VRW, 2005 WL 679745 at **6-7 (N.D. Cal. March 16,

4  2005) (distinguishing *Suniga* because the jury in that case was not instructed that assault with a

5  deadly weapon is a felony and because "the [erroneous] instruction was a solitary and

6  inapplicable statement of law among a large number of correct and applicable jury

7  instructions"); *Orellana v. Castro*, No. C 00-2466 SI (PR), 2001 WL 590006 at *5 (N.D. Cal.

8  May 23, 2001) (distinguishing *Suniga* on the basis that the predicate crime for felony murder

9  was not identified for the jury).

10         Accordingly, for the reasons set forth above, petitioner is not entitled to habeas relief on

11  this jury instruction claim.

12              **2.  Refusal to Give Proposed Jury Instruction Regarding Aiders and Abettors**

13         Petitioner's next claim is that the trial court violated his right to due process by "refusing

14  to instruct the jury that Aiders and Abettors may be found guilty of a lesser crime than that found

15  for the shooter." Dckt. No. 1 at 4.  Petitioner argues that the trial court's refusal to give this

16  instruction "removed from the jury the responsibility of finding the essential element of malice

17  as to petitioner Dich." Dckt. No. 15 at 22.  The California Court of Appeal denied this claim,

18  reasoning as follows:

19              **III. Refusal to Give Proposed Defense Instruction**

20              During a discussion of jury instructions, Lam's attorney requested
            that the trial court supplement CALJIC No. 3.00 with the language
21              italicized below: "Each principal, regardless of the extent or
            manner of participation, is equally guilty, *except that an aider and*
22              *abettor may be found guilty of a lesser offense than the*
            *perpetrator*." (Italics added.)  The trial court refused to give the
23              augmentation, ruling that it did not belong in the standard
            instruction.

24

25              Carroll, Cooc and Dich now claim the court committed prejudicial
            error in failing to accede to Lam's proposal, even though none of
26              them joined in it at trial.  They urge that the added language was a
            correct statement of law according to *People v. Woods* (1992) 8

Cal.App.4th 1570, 1589-1590, 11 Cal.Rptr.2d 231 (*Woods*), and necessary to a full understanding of principal and accomplice liability.

*Woods* does not support defendants' assertion that the trial court was obligated to give the augmentation.  In *Woods*, the jury sent a note to the court asking if an accomplice could be found guilty of murder in the second degree if the actual perpetrator were determined to be guilty of first degree murder.  (*Woods, supra*, 8 Cal.App.4th at p. 1579, 11 Cal.Rptr.2d 231.)  The trial court incorrectly answered the question, "No," and the appellate court reversed.  (*Id.* at pp. 1579, 1590.)  *Woods* never held or suggested that the jury should, as a routine matter, be advised of the viability of a lesser verdict as to an accomplice.

Here, the trial court specifically instructed the jurors that they must decide each defendant's guilt separately.  The jurors were also told that if they were not satisfied beyond a reasonable doubt that any defendant was guilty of the crime charged, they could find him or her guilty of any lesser crime shown by the evidence.  In closing argument, the prosecutor reminded the jurors: "We have five defendants.  You have to look at each individually and make a determination about each one individually."

Generally, "'a trial court may refuse a proffered instruction if it . . . is duplicative.'"  (*People v. Brown* (2003) 31 Cal.4th 518, 559, 3 Cal.Rptr.3d 145, 73 P.3d 1137.)  A trial court does not err by refusing to give specially requested instructions that are redundant (*People v. Cash* (2002) 28 Cal.4th 703, 736, 122 Cal.Rptr.2d 545, 50 P.3d 332; *People v. Turner* (1994) 8 Cal.4th 137, 203, 32 Cal.Rptr.2d 762, 878 P.2d 521) or adequately covered by other instructions (*People v. Noguera* (1992) 4 Cal.4th 599, 648, 15 Cal.Rptr.2d 400, 842 P.2d 1160).  Since the concept embodied in defendants' proposed modification of CALJIC No. 3.00 was conveyed by other instructions and each defendant had the opportunity to argue the principle to the jury, the court's refusal to give the proposed addition to CALJIC No. 3.00 was not error, or was certainly harmless.  (*See People v. Hughes* (2002) 27 Cal.4th 287, 361-363, 116 Cal.Rptr.2d 401, 39 P.3d 432.)

Opinion at **8-9.

The issue before this court is not whether the trial court's failure to give petitioner's requested jury instruction violated California law, but whether the trial court's failure to give the instruction violated petitioner's federal constitutional rights.  "[F]ederal habeas corpus relief does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  In the context of this habeas petition, the court must determine whether the state court's decision rejecting this

jury instruction claim was contrary to or an unreasonable application of United States Supreme

Court authority.

In general, a challenge to jury instructions does not state a federal constitutional claim.

*Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

right guaranteed by the fourteenth amendment."  *Cupp*, 414 U.S. at 146.  To prevail on such a

claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that

the resulting conviction violates due process.'"  *Prantil v. State of Cal.*, 843 F.2d 314, 317 (9th

Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its

determination, this court must evaluate the challenged jury instructions "'in the context of the

overall charge to the jury as a component of the entire trial process.'"  *Id.* (quoting *Bashor v.*

*Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where, as here, the challenge is to a refusal or

failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n

omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

law."  *Henderson*, 431 U.S. at 155.  *See also Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir.

1997).

The California Court of Appeal concluded that the trial court's failure to give a jury

instruction that Ly's co-defendants could be found guilty of a lesser offense than Ly was

harmless because other jury instructions essentially told the jury the same thing.  This conclusion

is not unreasonable.  Although petitioner's jury was not specifically told that "an aider and

abettor may be found guilty of a lesser offense than the perpetrator," the jury was informed that

"they must decide separately whether each of the defendants is guilty or not guilty," and that

they could find a defendant "guilty of any lesser crime provided you are satisfied beyond a

reasonable doubt that he or she is guilty of the lesser crime."  Clerk's Transcript on Appeal (CT)

at 1604, 1620.  Although these instructions do not contain the identical language suggested by

petitioner, they essentially gave the same message to the jury: that the culpability of each

defendant must be decided separately, and that each defendant could be found guilty of a "lesser

crime" if the evidence showed they were guilty of that lesser crime.  The prosecutor reinforced

this theme when she told the jury that "We have five defendants.  You have to look at each

individually and make a determination about each one individually."  Reporter's Transcript on

Appeal (RT) at 3458.  The jury was also informed that "an act that is a fresh and independent

product of the mind of one of the participants is not a natural and probable consequence." *Id.* at

3151.  Under these circumstances, the trial court's failure to give petitioner's requested

instruction did not have a "substantial and injurious effect or influence in determining the jury's

verdict." *Brecht*, 507 U.S. 619.  Accordingly, petitioner is not entitled to relief on this claim.

### 3.  Trial Court's Response to Jury Question

In a related claim, petitioner argues that the trial court violated his "State and Federal

Constitutional rights" when it erroneously responded to a jury question in a way that exacerbated

the court's refusal to give the jury instruction discussed in the immediately preceding claim.

Dckt. No. 1 at 5; Dckt. No. 15 at 27.

The background to this claim is the following.  During deliberations the jury asked the

following question: "We want to know, can you have second degree murder with lying in wait?"

RT at 3496.  The court responded, "Please clarify your question.  Is your question as to the

degree of murder or the special circumstance allegation within the meaning of Penal Code

Section 190.2(a)(15)?"  *Id.*  The jury responded to the court's question by asking: "Is it possible

for the jury to find the defendant guilty of second degree murder and lying in wait?  Or is the

finding of lying in wait significant in determining that the murder is first degree?"  *Id.* at 3497.

The trial court responded to this question as follows: "All murder which is perpetrated by means

of lying in wait is murder of the first degree.  You may find it helpful to refer to Instruction

////

////

21

8.25.[12]  If this answer does not sufficiently answer your question, or if you have additional

questions, please set them forth in writing."  CT at 1685.  Petitioner argues that "though this may

be a correct statement with respect to the shooter – Hung Ly, it was incorrect with respect to

each of the 'aiders and abettors' whose liability had to be assessed based on the natural and

probable consequence doctrine."  Dckt. No. 1 at 5.

Petitioner raised this claim on direct appeal.  He argued that "the court should instead

have told the jury, pursuant to *Woods, supra*, 8 Cal.App.4th at page 1579, 11 Cal. Rptr.2d 231,

that an aider and abettor may be guilty of second degree murder, even if the perpetrator

committed murder by lying in wait.  Opinion at *16.  The California Court of Appeal rejected

this argument, reasoning as follows:

> In rejecting this same claim on a motion for new trial, the trial
> court stated: "The Court's response to the jury's two questions
> about lying in wait and second degree murder . . . was a correct
> statement of the law.  The jury did not ask the question that the
> jurors did in *People v. Woods* (1992) 8 Cal. App.4th 1570, where
> the question was whether aiders and abettors could be guilty of a
> lesser degree of murder than the perpetrator.  Here there was no
> mention of aiders and abettors.  Instead the question was addressed
> to the degree of murder associated with lying in wait.  The Court
> correctly stated all murder committed by means of lying in wait is
> first degree murder.  It referred the jurors to an instruction
> previously given and invited additional questions.  There were
> none. [¶ ] The court cannot conjecture that the jurors were actually
> asking a different question from the one they actually posed."
>
> The court's ruling and observations were unassailable.  The
> question posed by the jury said nothing about aiding and abetting.
> The jury wanted to know if a defendant could be found guilty of
> both second degree murder *and* lying in wait.  The trial court
> properly answered that *all murder* committed by lying in wait is
> that of the first degree and referred it to the applicable jury
> instruction.  The jury, apparently satisfied, asked for no further
> elaboration.

* * *

////

---

[12]  Jury Instruction No. 8.25 stated, in pertinent part, that "Murder which is immediately preceded by lying in wait is murder of the first degree."  CT at 1587.

1         The trial court's decision to accurately answer only the question
2         that was asked by the jury was reasonable and proper.  No abuse of
        discretion occurred.

3  *Id.*

4         Petitioner argues that the jurors may have been asking whether they could find the aiders

5  and abettors guilty of second degree murder even if they concluded that Ly was guilty of first

6  degree murder.  However, there is no evidence in the record that this was the thrust of the jury's

7  question.  Nor is there any evidence that the jury was confused about whether it could find aiders

8  and abettors guilty of a lesser crime than the perpetrator.  The state trial and appellate courts

9  found that the jury's question was "addressed to the degree of murder associated with lying in

10  wait," and that the trial court's actions in referring the jury to CALJIC No. 8.25 cleared up the

11  jurors' confusion on that score.  This finding is not unreasonable.

12         "When a jury makes explicit its difficulties a trial judge should clear them away with

13  concrete accuracy."  *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946); *see also Weeks*

14  *v. Angelone*, 528 U.S. 225, 234 (2000).  However, where, as here, the trial judge "respond[s] to

15  the jury's question by directing its attention to the precise paragraph of the constitutionally

16  adequate instruction that answers its inquiry," and the jury asks no followup question, a

17  reviewing court can presume "that the jury fully understood the judge's answer and

18  appropriately applied the jury instructions."  *Waddington v. Sarausad*, 555 U.S. 179, 196 (2009)

19  (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to understand a

20  judge's answer to a question).  Under these established standards, it was not objectively

21  unreasonable for the state court to conclude that petitioner's jury received the answers it needed

22  to resolve its confusion over the degree of murder associated with lying in wait.  The fact that the

23  jurors asked no further questions and were able to reach a unanimous verdict indicates that they

24  were satisfied with the court's answer and that it cleared up their confusion.  Accordingly,

25  petitioner is not entitled to relief on this claim.

26  ////

### 4.  Improper Exclusion of Evidence

In his third ground for relief, petitioner claims that the trial court violated his constitutional rights to due process and to present a complete defense when it excluded Ly's statements to police that he shot Seivert because he believed Seivert was about to run him over with his car.  Dckt. No. 1 at 5.  The California Court of Appeal denied this claim, reasoning as follows:

### II. Exclusion of Ly's Statements to the Police

Pursuant to Evidence Code sections 1250 and 1252, Carroll, Cooc, Dich and Lam moved to introduce Ly's statements to police, in which Ly claimed that he shot Seivert because he feared that the victim was about to run him over.  The statements were made on January 10, almost three weeks after the killing of Seivert.  After initially denying any connection with the murder, Ly admitted that he fired three shots at the Camry, adding that he did so because he thought Seivert was going to run him over.

The trial court refused to admit the evidence, finding that, under the totality of the circumstances, the statements were not trustworthy because they were made (1) in a coercive atmosphere of police interrogation; (2) while Ly knew he was under suspicion for murder; and (3) at a time when Ly "had every reason to come up with an explanation for his actions."  Defendants claim the evidentiary ruling constituted an abuse of discretion.

Evidence Code section 1250, subdivision (a) provides: "*Subject to [Evidence Code] Section 1252*, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Italics added.)  Section 1252 provides: "Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

"'The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.  Such an endeavor allows, in fact demands, the exercise of discretion.' [Citation.]  A reviewing court may overturn the trial court's finding regarding trustworthiness only if there is an abuse of discretion." (*People v. Edwards* (1991) 54 Cal.3d 787, 819-820,

1 Cal.Rptr.2d 696, 819 P.2d 436 (*Edwards*).)

"To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are '"made at a time when there was no motive to deceive."'" (*Edwards, supra*, 54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.)

We can conceive of few examples of an untrustworthy statement more worthy of exclusion under Evidence Code section 1252 than one made by a defendant who, during a police interrogation, after having initially denied any involvement in the crime, makes a statement admitting guilt but seeking to minimize or eliminate his culpability. As in *Edwards*, where the defense sought to introduce a taped statement by the defendant shortly after his arrest, Ly "had a compelling motive to deceive and seek to exonerate himself from, or at least to minimize his responsibility for, the shooting[ ]."

(*Edwards, supra*, 54 Cal.3d at p. 820, 1 Cal.Rptr.2d 696, 819 P.2d 436.) The trial court did not abuse its discretion.

Even if the trial court erroneously excluded Ly's statements, we see no prejudice from the ruling. The jury heard testimony from several different sources that Ly told his companions after the shooting he "did what [he] had to do" and that he shot Seivert because he feared Seivert was going to run him over with the Camry. Indeed, defense counsel used these statements as a cornerstone of their argument against a murder verdict. Ly's unsurprising repetition of the same exculpatory statements almost three weeks after the shooting was cumulative of other testimony and would not have significantly altered the jury's evaluation of the events that night. Under any standard, the error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *see also People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103, 31 Cal.Rptr.2d 321, 875 P.2d 36 [applying harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243 (*Watson*) to erroneous exclusion of evidence].)

Opinion at **7-8.

Petitioner claims that Ly's statements to police were "central to the claim of imperfect self-defense, and thus fundamental to Petitioner's defense that he could not be held vicariously liable for the first-degree murder because Ly did not have the requisite mental state to commit that offense." Dckt. No. 1 at 5. Petitioner also argues that Ly's statements were "far more detailed and compelling than any second-hand recitation regarding Ly's perceptions could have

25

been." Dckt. No. 15 at 33. Similarly, he argues that testimony at trial from other witnesses

"could not replace Ly's statement to the police" because Ly's statements were "the only first

hand account from the shooter of his motivations for firing the weapon." *Id.* at 34.

The United States Supreme Court has acknowledged a "traditional reluctance to impose

constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*,

476 U.S. 683, 689 (1986). Accordingly, a state court's evidentiary ruling, even if erroneous, is

grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair

as to violate due process. *Estelle*, 502 U.S. at 68-70. The United States Supreme Court has not

"squarely addressed" whether a state court's exercise of discretion to exclude testimony violates

a criminal defendant's right to present relevant evidence. *Moses*, 555 F.3d at 758-59.

Accordingly, the decision of the California Court of Appeal that the trial court's discretionary

evidentiary ruling did not violate the federal constitution is not contrary to or an unreasonable

application of clearly established United States Supreme Court precedent and may not be set

aside. *Id. See Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (per curiam) (relief is

"unauthorized" under Section 2254(d)(1) when the Supreme Court's decisions "given no clear

answer to the question presented, let alone one in [the petitioner's] favor," because the state

court cannot be said to have unreasonably applied clearly established Federal law). *See also*

*Anguiano v. Morales*, No. C 98-4751 SI(PR), 2000 WL 630870 at *9 (N.D. Cal. May 2, 2000)

(trial court's exercise of discretion under Cal. Evid. Code § 1252 to exclude untrustworthy

evidence did not violate defendant's right to present a defense).[13]

---

[13]  In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality of a trial court's discretionary decision to exclude evidence. *See Miller v. Stagner*, 757 F.2d 988, 994–95 (9th Cir. (1985). That test was also employed in *Chia v. Cambra*, 360 F.3d 997, 1003-04 (9th Cir. 2004), the case relied on by petitioner in support of this claim. However, in *Moses*, the Ninth Circuit concluded that the *Miller* balancing test "is a creation of circuit law," rather than clearly established Supreme Court precedent, for purposes of Section 2254(d)(1).  555 F.3d at 759–60.  Therefore, the *Miller* test should not be used in federal habeas review of a challenge to a state court's exercise of discretion to exclude testimony pursuant to a state evidentiary rule affording such discretion. *Id.* "The AEDPA does not permit [a habeas court] to rely on [the

1    Even assuming arguendo that the trial court's exclusion of Ly's statements to police was

2    constitutional error, the error could not have had a "substantial and injurious effect or influence

3    in determining the jury's verdict" under the circumstances of this case. *Brecht*, 507 U.S. at 623.

4    Several trial witnesses testified that Ly told them he shot Seivert because he thought Seivert was

5    going to run over him with his car. One witness testified that Ly shot Seivert "as defense." *See*

6    RT at 1907-08, 1989, 2151, 2285-86, 2309, 2311. Ly's statements to police were essentially

7    cumulative of this trial testimony. *See* CT at 2861, 2874-78, 2880-81, 2906. Several of the

8    defense counsel, including petitioner's counsel, emphasized this trial testimony in their closing,

9    arguing that Ly shot Seivert because he was afraid he was going to get run over by Seivert's car.

10   *See, e.g.*, RT at 3247-49 (Ly's counsel), 3310, 3312 (Lam's counsel), 3412-13 (petitioner's

11   counsel). Accordingly, Ly's state of mind at the time of the shooting; i.e., that he shot Seivert

12   only after Seivert attempted to run him over, was squarely before the jury. The absence of

13   cumulative testimony to the same effect would not have effected the outcome of this trial.

14   The decision of the California Court of Appeal was not contrary to or an unreasonable

15   application of clearly established Federal law on the constitutional rights to due process or to

16   present a defense. Accordingly, petitioner is not entitled to relief on this claim.

17   **5. Jury Instructions on Accomplice Liability**

18   In petitioner's final ground for relief, he claims that "the trial court erred in refusing to

19   instruct the jury, as requested, that Johnson Phan was an accomplice; and further erred in failing

20   to instruct that a conspirator may be considered an accomplice." Dckt. No. 1 at 7. The

21   California Court of Appeal denied this claim on state law grounds, reasoning as follows:

22       The trial court ruled that trial witnesses Quoc, Nguyen, Su, To and
         Voong were accomplices as a matter of law. However, it left it up
23       to the jury to determine whether witness Johnson Phan was an

24   ────────────

*Miller*] balancing test to conclude that a state trial court's exclusion of evidence . . . violated
25   clearly established Supreme Court precedent." *Id.* at 760.

26

accomplice.  The jury was also given standard instructions that a defendant could not be convicted solely on the uncorroborated testimony of an accomplice (§ 1111), and that an accomplice's testimony should be viewed with caution.

Carroll and Ly, joined by Cooc and Dich, contend that the trial court erred in refusing their request to instruct the jury that Phan was an accomplice as a matter of law.  We disagree.

Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."  In order to be chargeable with the identical offense, the witness must be considered a principal under section 31.  (*People v. Hoover* (1974) 12 Cal.3d 875, 879, 117 Cal.Rptr. 672, 528 P.2d 760.)  That section defines principals to include "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.)

A witness's status as an accomplice "is a question for the jury if there is a genuine evidentiary dispute [on knowledge and intent] and if 'the jury could reasonably [find] from the evidence' that the witness is an accomplice."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1174, 5 Cal.Rptr.2d 268, 824 P.2d 1315, citing *Hoover, supra*, 12 Cal.3d at p. 880, 117 Cal.Rptr. 672, 528 P.2d 760.)  """Where such witness is an accomplice as a matter of law, the court should so charge . . . .  Conversely, where, as a matter of law, the witness is not an accomplice, the court does not err in refusing to charge that he is or in refusing to submit the issue to the jury.""'" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1159, 123 Cal.Rptr.2d 322, fn. omitted.)

The trial court properly submitted the question of Phan's accomplice status to the jury, because there was conflicting evidence on the issue.  Phan testified that he was watching television with several friends at Ly's house when he heard them discussing a plan to beat up Seivert.  Although Lam said they were going to beat up Seivert for calling them names, Phan did not have a problem with Seivert; in fact, they used to "goof off" with each other at school.  Phan was not offended by Seivert's name-calling and did not want to harm Seivert, whom he considered a friend.  When he accompanied Lam and the others to the scene, Phan was in his pajamas and slippers.  He went to the park "just to watch."  He sat silently in the car through the entire incident.  Phan denied that he had any intention to attack Seivert or that he uttered any words of encouragement to his friends.

////

Carroll and Ly acknowledge that Phan may not have been an accomplice by virtue of encouragement or assistance, but insist the evidence showed conclusively he was a co-conspirator, based upon two selective excerpts from his testimony: First, when asked who agreed to beat up Seivert, Phan said, "Basically everybody." Second, Phan testified, "He [Lam] just said [he] want[ed] to jump this white dude named Matt.  I was like, sure, why not."

These two statements do not establish Phan was a co-conspirator as a matter of law.  "'Conspiracy is a "specific intent" crime . . . . The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy . . . .  To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they intended to commit the elements of that offense.'"  (*People v. Swain* (1996) 12 Cal.4th 593, 600, 49 Cal.Rptr.2d 390, 909 P.2d 994.)

Phan's statement that "basically everybody" agreed to beat up Seivert was equivocal and did not necessarily mean that he endorsed the plan, especially in light of his numerous other statements denying any intent to harm Seivert or participate in the beating.  Likewise, Phan's statement, "sure, why not," in response to Lam's statement that he (Lam) wanted to "jump" the "white dude," does not compel the inference that Phan conspired to assault Seivert.  In a room full of youths discussing a group beating, such a response could well be construed as equivalent to a shrug of the shoulders – not an expression of shared specific intent to commit a crime.

Although a reasonable trier of fact could draw contrary inferences, there was substantial evidence that Phan did not intend to assault Seivert and his participation was limited to mere presence at the scene.  Accordingly, the trial court did not err in submitting the question of his accomplice status for determination by the jury. (*See People v. Stankewitz* (1990) 51 Cal.3d 72, 91-92, 270 Cal.Rptr. 817, 793 P.2d 23; *People v. Garrison* (1989) 47 Cal.3d 746, 772, 254 Cal.Rptr. 257, 765 P.2d 419.)

Opinion at **10-11.

Although petitioner raises several non-cognizable state law arguments, the gist of his

federal argument is that his conviction was improperly supported, in part, by the uncorroborated

testimony of accomplice Johnson Phan.  However, in federal court "a conviction may be based

on the uncorroborated testimony of an accomplice."  *United States v. Turner*, 528 F.2d 143, 161

(9th Cir. 1975).  *See also Caminetti v. United States*, 242 U.S. 470, 495 (1917) ("there is no

absolute rule of law preventing convictions on the testimony of accomplices if juries believe them."); *United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless it is incredible or insubstantial on its face"); *Cummings v. Sirmons*, 506 F.3d 1211, 1237 (10th Cir. 2007) ("[petitioner], however, has identified no Supreme Court decisions establishing a constitutional requirement that the testimony of an accomplice-witness be corroborated")*; Harrington v. Nix*, 983 F.2d 872, 874 (8th Cir. 1993) ("[S]tate laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review."). California Penal Code § 1111, which requires corroboration of accomplice testimony, is a "state law requirement" which is "not required by the Constitution or federal law." *Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000). Petitioner's claim that uncorroborated accomplice testimony was improperly used to support his conviction is based solely on a perceived error of state law and is therefore not cognizable in this federal habeas corpus proceeding. *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

Because Phan's testimony was neither incredible nor insubstantial on its face, petitioner is only entitled to habeas corpus relief on this claim if the state court's alleged violation of state law denied him his due process right to fundamental fairness. *Lewis*, 497 U.S. at 780; *Laboa*, 224 F.3d at 979. "A State violates a criminal defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a state law entitlement." *Laboa*, 224 F.3d at 979 (citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). State criminal procedures do not violate the Due Process Clause unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996). Here, the California Court of Appeal carefully reviewed the evidence and determined that the trial court properly left to the jury the question of whether Phan was an accomplice to the murder of Seivert, largely because the evidence was insufficient to determine this issue as a matter of law. This determination by the Court of Appeal does not constitute an

arbitrary denial of a state law entitlement.  Nor does the court's ruling offend a fundamental

principle of justice or render petitioner's trial fundamentally unfair.  Accordingly, petitioner is

not entitled to relief on this claim.

**IV.  Conclusion**

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

his objections petitioner may address whether a certificate of appealability should issue in the

event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

enters a final order adverse to the applicant).

DATED:  April 5, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE